STARK et al. v. LEONARD et al.

(Court of Civil Appeals of Texas. Beaumont. June 21, 1917.)

1. ADVERSE POSSESSION ⟨⟩85(3) — EVIDENCE.

In action to recover land claimed by virtue of the 10-year statute of limitation, which land plaintiff claimed was verbally given her by her father, evidence tending to show that the only claim of ownership to the land was made

by her father *held* not sufficient to show plaintiff's adverse occupation.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 499, 500, 503, 688–690.]

2. NEW TRIAL ☞102(3)—NEWLY DISCOVERED EVIDENCE.

In action to recover land, showing of newly discovered evidence as to adverse possession of plaintiff *held* sufficient to require new trial.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 207, 212.]

Appeal from District Court, Newton County; A. E. Davis, Judge.

Action by Lou Leonard and others against W. H. Stark and others. From judgment for plaintiffs, defendants appeal. Reversed and remanded.

Holland & Holland, of Orange, for appellants. Powell & Huffman, of Jasper, and Wightman & Hancock, of Newton, for appellees.

BROOKE, J. This is an action brought by appellees to recover 160 acres of land, part of the John McGee league in Newton county, claimed by virtue of the 10-year statute of limitation, it being admitted that appellants own the regular record title, and are entitled to the property, except for the limitation plea. One Richard Holmes, the father of Lou Leonard, in about 1872 bought out a claim asserted by one Joe Hardy to the land, it being then supposed that the land was vacant public domain subject to settlement, and appellee, who was then Lou Foster, the wife of one Dan Foster, with her husband moved on the land where they lived a short time, after which Dan left the country and his wife, Lou, lived with her father and mother, who then lived on the David McWilliams tract of land, adjoining the land in controversy, where she remained until she married Levi Leonard in 1881. Shortly after Lou and Levi were married, they lived on the land sued for, and afterwards at different places, until they pre-empted a tract of land in 1896, where they have since lived. The land in controversy covers a part of the John McGee league, and a part of the David McWilliams original location, and all of the T. P. Dickerson survey, conflicting and being covered by the three tracts of land mentioned. Appellees based their right to recover on the ground that when Richard Holmes bought the Hardy claim he gave it verbally to his daughter Lou, who subsequently occupied and claimed the particular 160 acres for a length of time sufficient to mature in her a limitation title. At least the questions of fact submitted to the jury were answered favorably to appellees' claim. In 1872, about the time Richard Holmes acquired the Joe Hardy claim, and after he had bought and was living on the David McWilliams tract, he had the land surveyed by the county surveyor, in an attempt to file on same as vacant land, and subsequent to that time the land was known as the Richard Holmes survey, and Richard Holmes rendered the same for taxes and paid taxes on same until it was discovered that the land was not all public land, and was in conflict with the John McGee league as well as the David McWilliams original location, and he then abandoned all claim to the Richard Holmes tract, the land sued for, being at that time the owner of the David McWilliams, and residing thereon. The David McWilliams field notes were corrected, and the 62 acres thereof not in conflict with the McGee was patented, and that part of the Holmes tract, the land sued for, not in conflict with the McGee was subsequently awarded as public land to T. P. Dickerson in March, 1902. The portion of the land sued for, the Holmes tract, in conflict with the McWilliams was patented under the McWilliams entry, and in this condition appellants acquired by purchase for value the land as a part of the John McGee league in 1900, obtaining a regular and perfect title of record from the sovereignty. There was a judgment for appellees for so much of the land sued for as was located on the McGee league, and after the judgment of the lower court had been entered, motion for new trial was made, on the ground, among other things, of newly discovered testimony. The motion was overruled, and appellants have properly perfected this appeal.

The first and second assignments of error and the third will be considered together, being as follows: (a) The court erred in refusing to give the peremptory instruction to the jury to return a verdict in favor of defendants, as requested by defendants. (b) The court erred in submitting question No. 1 to the jury, for the reason that the undisputed evidence in the case shows that the plaintiffs and the persons under whom they claim, through themselves or through tenants, have failed to hold peaceable and adverse possession of the premises sued for, claiming the same for 10 consecutive years before the filing of this suit. (c) The response of the jury to question No. 1 is contrary to the preponderance of the evidence, and not supported by the evidence, in that the evidence discloses that the plaintiffs had not in person or through their tenants had peaceable and adverse possession of the land in controversy, cultivating, using, and enjoying the same for a period of ten consecutive years before the filing of this suit. This is followed by the proposition that the evidence shows that the only occupancy of the land had by any person was under a claim of ownership in Richard Holmes and not in appellee.

Lou Leonard, who is the plaintiff in the case, testified as follows:

"My name is Lou Leonard. My father's name was Richard Holmes, and my mother's name was Cynthia Holmes. I have a sister and a brother. Their names are Will Holmes and Mazy Holmes. They are the only children of my father and mother living. My mother and

father are both dead. I have been married twice. I first married Dan Foster. The first year after I married Dan Foster, we made a crop with Mr. Charley Holmes. I made a crop the year I married Dan. We went then to the place called the Joe Hardy place my papa bought. As to whose place was the Joe Hardy place, will say my papa got it from Mr. Joe Hardy, and we called it his place. I came by it by my father giving it to me. As near as I can come at it, this tract of land I call the Joe Hardy tract that my father gave me is a mile or a mile and a half southwest of Farrsville. It is the place me and Dan went to the year after we married. Dan and I lived there on the place two or three months. Dan went off. He went off when we were there two or three months. When we first went on the place, we went on another place. We went on the place where we went to make a crop, and we came back on the place that my papa gave me; then we changed places with him because the house wasn't big enough. When we lived there two or three months, Dan wanted his sister to live with us, and the house wasn't big enough, and we left that place and went to the Dave Mack place, changed places with my father; and while we were there, Dan got into some trouble and went off. I then moved right back in the house with my papa. When me and my husband went over to the Dave Mack place, my father was on the place he gave me, on the Joe Hardy tract. When my husband left, I went right back to my place that my father gave me. I married Levi Leonard the second time. I don't know exactly what year I married him. From the time I went back to the Joe Hardy place after my first husband went off until I married Levi Leonard, I lived on the Joe Hardy place with my father; I worked about and stayed with my father. I didn't move anywhere. During this time, my household goods stayed right on the same place with my father until I married. The place was cultivated and worked every year by me and my father. I don't know what year I went there and don't know the year I married Foster; I couldn't tell you exactly what year. The Joe Hardy place was run out. Mr. Allison Nations run it off. When that was done, I was living right on the place, me and Dan. The place that Mr. Allison Nations run off is the same place I call the Joe Hardy place that my father gave me. When I married Levi, I was living on that same place the Joe Hardy place. After we married, Levi moved me to a place at Shanklesville. We married and finished this crop, and then we moved back there that same year at my place that my papa gave me. At Shanklesville, we lived at the place called the Ben Pierce place, as near as I can remember. As to how long we stayed on the place at Shanklesville, will say I think we married some time in April, and we stayed up there long enough to make a kind of a crop, and moved back that same year. We moved back the same year after we gathered the little crop. I don't know exactly how many years I lived on the place after Levi and I moved back down there, but we lived there, I suppose 9 or 10 years, long enough to birth three children anyhow; I don't know how many years. I had three children born there on the place after I moved back before I moved off at all; that is, after Levi and I married and moved back there. As to who worked the place while Levi and I were gone up to Shanklesville, that year, will say my father had started a crop before I married, and after I married he finished his crop, and me and Levi finished ours, and moved back, and when I moved back, papa gathered his crop that year and moved to give me possession. I had three children born on the place after me and Levi Leonard moved back there. The difference between the ages of those children was about 2 years and ·6 months. There was about 2 years and 6 months between each one, and there was three

of them born on that place. After that, we went to the place called the Woods place. After we went to the Woods place, we rented my place then, if I mistake not, to John Fowler; Levi and I were claiming that place at the time we were living there. It was my place, and I am claiming it until yet.

"I don't know how many acres was cleared on that place. I believe the first house that me and Dan moved into on the place was built out of some rough-edged lumber. The house that me and Levi moved into first on the place was a log house, and we kinder put a little room to it, boxed room, as near as I can remember—it has been so long. Oh yes, we had a large field there. It was fenced with rails. I don't know how many acres was in the field that we had cleared there; I couldn't say.

"I stated that my father bought that place from Joe Hardy. He paid 200 barrels of corn for it. After me and Levi came back from Shanklesville and went on the Joe Hardy place, during the time the three children was born on the place, my father and mother lived on the David McWilliams place. He had done given me up possession then. I always called it a half a mile from the David McWilliams place to the Joe Hardy place where I was living. That is as near as I can come at it.

"I couldn't tell you how old I am. I don't know. I don't know when I was born. I was born during the War. I don't know where I was born either. It was after the War when I married Dan Foster; I don't know how long. I don't know how old I was when I married Dan Foster. I lived with Dan Foster a year and two or three months, as near as I can come at it. I was living at the place called the Hinds place when I married him. I was living with my father and mother, and they were living on the Hinds place. As to how long I lived on the Hinds place after I married Dan, will say we left there that fall. We lived with my father and mother awhile. We lived right there with them, in the house with them. The next year, we went to the Charley Holmes place. My father and mother did not go to the Charley Holmes place. They stayed on the Hinds place. As to how long we lived at the Charley Holmes place, will say, we stayed there long enough to make a crop. We stayed there one year. From there, we moved to the place my father gave me, the Joe Hardy place. My father did not move there when we did. He moved there after we moved there; it might have been a month or three or four weeks afterwards, as near as I can come at it. He did not live in the same house with us. There was just a little space between the houses. There was two houses on the place when we went there. I lived in one of them, and my father, in two or three weeks or a month, moved in the other. As to whether or not that was on the David McWilliams place, will say it was called the Joe Hardy place, the place my father bought for me. I suppose that is a different place from what I call the David McWilliams place. Q. I want to know if it is a different place from what you call the Dave Mack place? A. Yes, sir; I suppose it was. Q. Don't you know whether it was or not? A. Yes, sir. I reckon it was. Q. I said, don't you know whether it was or not? A. Yes, sir; we called it the Joe Hardy place. Q. That is not the same place you call the Dave Mack place? A. I don't suppose it was. Q. Do you know whether it was or not? A. No, sir; it wasn't the same place. As to how far it was from the Dave Mack place, will say, I don't know how far the lines were apart. The houses were called a half a mile apart. My father owned the David McWilliams place. He bought the David Mack place after he bought my place. I believe he bought the David Mack place from a man named Mr. Porter Parks. He bought it after he moved off of the Joe Hardy place. He bought the David Mack place after he moved

off the Joe Hardy place. He was living with me on the place he gave me when he bought the David Mack place. Q. I thought you said that was the Joe Hardy place? A. You asked me where was he living when he bought the David Mack place? He was living on the place that he bought for me. Q. I thought you told me he bought the David Mack place after he moved off of the Joe Hardy place? A. After he moved off? Q. I asked you when he bought the David Mack place, if he bought the David Mack place while he was living on the Hardy place, and you said he bought it after he moved off of the Joe Hardy place. A. Well, I made a mistake if I told you that, because he bought the David Mack place when he was living with me, paid for it. He was living on the Joe Hardy place with me when he bought the David Mack place. I don't know how long it was after he bought the David Mack place before he moved down on the David Mack place. He was so long paying for it, I don't know. Q. I don't care whether he ever paid for it or not; did he move from your house over there on it? A. I don't know, sir, whether he did or not. When he moved off the Joe Hardy place that he gave me, he moved on the place that he bought, the David Mack place. I don't know whether he moved right to the David Mack place right after he bought it or not; he had done bought it when he moved there. He bought it to move over there. He bought it to live on it because he was living on my place. There was somebody living on the David Mack place when he bought it. As to who was living there, will say he had it rented. Q. When your father bought the David Mack place, was there anybody living on it? A. Yes, sir. Q. Who was living on it? A. I am trying to study now, I believe it was a family they called Aunt Rhodie and Aunt Charlotte, widow women. They were living on the David Mack place. My father rented it to them. As to how came him to rent it to them when he didn't own it, will say he was in possession of it; he had made a trade for it. I don't know how long they lived there. As to whether or not that has been 25 or 30 or 40 years ago, will say, it has been somewhere along there; I don't know exactly. I don't know how many years they lived there. They are not still living; they are both dead. The house they were living in was about half a mile from where I lived. I don't know who built the house they were living in. It was built there when I went on the Hardy place. There was somebody living on it when I went on the Hardy place. There was a white family living in it when I went on the Hardy place; I don't know whether it was Shug Cade or Wash McWilliams. There was a white family living there when I went on the Joe Hardy place. I don't know how long they were living there when I went on the Joe Hardy place. I have no idea. It has been a long time, and I don't know. I don't know whether it was a short time or long time.

"As to how long my father lived on the Joe Hardy place, will say, before he moved off of it he lived there, I reckon, about 7—all together he lived there regularly 7 or 8 years, as near as I can recollect. He did not live with me in the house all the time he lived there; he lived on the place. It was a double-pen house. He lived in one house and me in the other. He did not live there all the time I lived there. He lived there until he gave me possession. I lived there all the time he lived there, because I was living there first. I went there first and stayed there longer. I was living there when he moved away. I had one child by Dan Foster, a girl. That child was born on the Joe Hardy place. That girl is still living. She is not here. She is with her husband somewhere. She is not in this county. She is in Jasper county. I don't know how old she is. When I married Levi, I was living there on the Joe Hardy place, the place my father bought and gave me. I was living right there on that same place that I moved to. I was living on the Joe Hardy place that my papa bought from Joe Hardy. That is where I was living when I married Levi. As to how long after I married Levi before my first child was born by Levi, will say it might have been a year and it might have been a year and six months. It was something like a year or more. The child by Foster is named Lonie. The first child by Levi is named Aus. That is a boy. I don't know how much older Lonie is than Aus. Lonie was a good big-sized girl when Aus was born. Aus was born there on the Joe Hardy place. I believe he was born in the same house that Lonie was born in. As to where I went to when I married Levi, will say Levi had a little farm at Shanklesville, and we went up there and made that little crop in April after we married; then we moved back on the place. We moved back in the same house that I moved out of. We went up to Shanklesville and finished up Levi's crop and went back in the same house. Lonie did not go up to Shanklesville with us; she stayed there with her grandmother. Aus was born after I got back from Shanklesville. My father and mother were living right there in the same house when I got back from Shanklesville. After I got back from Shanklesville, then is when they moved away, moved to the place on the David Mack. Lonie did not move with them down on the David Mack place; she stayed with me upon that place. I still lived in the same house. My next child is named Hezekiah. That is another boy. He was not born in the same house; we had moved out of the field and built, him and me. That was right on the same place. As to how far that was from the other house, will say it was just a little outside of the fence. As to how many feet it was from the other house, will say, it wasn't so very far. It was not a half a mile. It was just about like this courthouse yard fence; I don't know whether it was that far or not. I did not have a little field it was a large field. Q. If it was a large field, you must have moved quite a little ways. A. We went back on the outside of the field and built another house. That was before Hezekiah was born. My mother and father were then living on their place, on the David Mack place. The place I am talking about my father giving me was the Joe Hardy place; he bought it from Joe Hardy. After me and Dan married, he gave it to us. He bought the place and gave it to us before we moved on it. He gave it to me before I moved on it. My father never did own that place and live on it. He bought it and gave it to me. My father never did claim it that I know of. He was living right there with me on the place, but he never did claim the place. He never did own it except when he bought it and gave it to me. He bought it and gave it to me when I married. All during the time he lived there, he didn't make any claim to the place at all. As to whether or not I claim it because I claim he gave it to me, will say he gave it to me. That is all the way I claim it. He gave it to me. Q. Where did you and Levi go after you left there? A. What do you mean? Going when? Q. Where did you move to when you moved away from there? A. The last time we moved? Q. The first time you moved? A. After we got back from Shanklesville? I don't remember. Q. When you got back from Shanklesville, you went back on this place and you stayed there awhile, then you moved away, where did you move to? A. That is what I don't know; no other time only the time I am trying to tell you. Q. The first time you moved away? A. After we married, we moved to Shanklesville, and one year we made a crop with Mr. Holmes. Q. One year you went over to Mr. Holmes' after you got back from Shanklesville? A. Yes, sir. Q. Where did you live then? A. That is what I am telling you now. We went to Mr. Holmes'

and made a crop that year, and after we gathered the crop we went right back home.

"As to where we lived when we made the crop with Mr. Holmes, will say we were staying with Mr. Holmes when we made the crop. We were staying on Mr. Holmes' place the year we made the crop there. We lived in a boxed-house there. Nobody lived with us. Nobody else lived in that house that we lived in on Mr. Holmes' place while we were living there. Me and Levi lived there, and that is all that lived in that house. We had three children with us there. Lonie was with me there. I had two children besides her when I lived on Mr. Charley Holmes' place. I don't know how far that is from the David Mack place; I believe it is called 2 or 3 miles. I don't know how far it is. I am telling you what I guess. When I was going to see my mother, I always called it 3 miles; some might have called it further; I don't know. I think it was about 3 miles. It was a long ways to me. It might have been 2 miles or a mile and a half from the Hardy place. When we moved up there and made the crop on Mr. Charley Holmes' place, the house that we moved out of on the Hardy place was vacant. My mother and father were on the David Mack place, and there wasn't anybody on the Joe Hardy place. We worked that land, part of it, and we kept in possession of the place just the same. Nobody lived there; we moved back the same year. During the time we were over there making the crop, there wasn't anybody on the Joe Hardy place. After we made the crop on the Charley Holmes' place, the house that we moved out of on the Hardy place was vacant. My mother and father were on the David Mack place, and there wasn't anybody on the Joe Hardy place. We worked that land, part of it, and we kept in possession of the place just the same. Nobody lived there; we moved back the same year. During the time we were over there making the crop, there wasn't anybody on the Joe Hardy place. After we made the crop on the Charley Holmes' place, we went back on the Joe Hardy place. We gathered the crop that year, and moved right back there that year in the same house. After we moved back there, this third child by Levi was born. As to how long after we moved back that time before the third child was born, will say about 2 years and 6 months, I believe, is the difference in all of my children. I have had more than three children by Levi. The name of the third child is Tom. Tom came after Hezekiah. He was born after we came back from the Charley Holmes' place. Tom is dead. I don't know how old he was when he died; he was a young man, grown. Hezekiah is also dead. He was a baby when he died. As to where he was buried, will say they were all buried at Pleasant Hill Grove. I reckon that is about a mile, maybe, a little further, from the Joe Hardy place. I was living on the Joe Hardy place when he died; I was living right there. Tom was born after I moved back there. I believe we moved to the Woods place next. The very next place we moved to was the Woods place. As to what place that is, will say, all I know is the Woods place. I don't know how far that is from the Joe Hardy place. I don't know how far it is from the David Mack place; it might have been 3 or 4 or 5 miles, I don't know. I don't know how far it was. It might have been 4 or 5 miles. As to what we did over there, will say we worked. Sometimes I washed and cooked. Levi was there. As to what he did, will say, sometimes he called himself farming. That was on the Woods place. As to how came us to move to the Woods place, will say we had a notion of buying some more land; he wanted to buy a place when he moved there. I reckon that is how came us to move. That is what he told me. There was a house there on the Woods place when we went there. Nobody else lived in that house with us, just me

and my family. I had four children then, Lonie and three children by Levi. I believe Levi made a crop over there. I believe we lived over there a year; it might have been 2 years; it has been so long. As to whether or not I want to say we lived there a year and we might have lived there 2 years, will say I want to say we lived there a year; I don't know for certain whether we lived there a year or not; it has been so long. We might have lived there a year; I don't know. I cooked for myself. I did not work for anybody else. We gathered our crop there that we raised; we gathered what we made. As to whom we rented that place from, will say we went there to buy. We did not buy it. We did not pay the rent on it while we worked it. We didn't pay anything. We bought it from Mr. Woods or somebody; I don't know; it has been so long. I don't know what Mr. Woods it was; all he told me was Woods. I did not have any children born on that place. During the time I lived there, my father was living on the David Mack place still. As to whether or not there was anybody living on the Joe Hardy place, will say we had it rented to John Fowler. He was living on the Joe Hardy place. I think John Fowler lived on the Joe Hardy place, as near as I can recollect, 5 or 6 years. He had it rented that long or maybe not so long or longer. I don't know whether he lived there 5 or 6 years or not. I don't know whether we lived on the Woods place but 1 year or not. We did not live on the Joe Hardy place when Fowler lived on the Hardy place. We did not live on the Hardy place when Fowler was living there at any time. We rented it to him. As to whether or not we lived on the Woods place 1 or 2 years, will say I don't know whether we lived there one year or not; it has been so long. I don't know where we went to when we left over there; it has been so long. After we went away from the Woods place, we went backwards and forwards to the Hardy place. We never did move back. We never did move back to the Hardy place from the time we left there and went over to the Woods place. We kept it rented. We didn't move back to the Hardy place because we had it rented and didn't want to. I said we went to the Woods place to buy it, but we didn't buy it and didn't rent it. We bought another place.

"As to whether or not when we went from the Woods place we went on the place we bought, will say after that we did. That was the place where we are living at now. We did not go from the Woods place to where we are living now. There are other places that we went to before we went to where we are living at now. We never did buy a place until we bought the place we are living at now. We went around to several places before we bought this place where we are living at now. I don't know what other places we went to; we were moving around. We went to lots of places; rented different places. We went around to several different places and rented places. We rented our place and worked other places. We moved around to those several different places. As to how many places we lived on after we went from the Woods place, will say, we went to the Irvine place. It seems to me like we went to the Irvine place from the Woods place. The next place we went to, it seems like, was the Sam Robertson place, and the next place it seems to me like, was the Lane place. That is three, and then the place we are living at now. I don't know how long we lived on the Irvine place. I don't know how many crops we made over there. I have got more children besides those I named. I have some children younger than Tom. The next one to Tom is Edith. If I make no mistake, Edith was born at the Irvine place. We didn't rent the Irvine place; we just went there and improved it. We just went there to stay; we didn't rent it at all. As to whether or not

there was any house there when we went there, will say there was a kind of a pole house. There was no field there when we went there; we improved it. We just went there and fixed us up a house and put us in a field. I don't know how far the Irvine place was from the David McWilliams place. It might have been 3 or 4 miles. I don't know how long we stayed there. I do know that we built us a house there and put us in a field, and that that girl I named was born there. There was not any more of my children born there. Then we went to the Robertson place. I don't know how far that was from the David McWilliams place. I don't know whether it was 2½ miles or 3 miles. I guess it was 2 or 3 miles. As to who we rented that place from, will say, we just went there that year and worked it and kept the place up. We got it from Mr. Sam Robertson. We made a crop there that year. We moved away from the Irvine place and moved over there because we didn't like the place, and we just kept moving until we got satisfied. We didn't like the Woods place, and we moved over there and made an improvement on the Irvine place, and we didn't like the Irvine place, and we made arrangements with Mr. Robertson and went over there to live on the Robertson place a year or two. None of my children were born on the Robertson place. Q. What is the next child to Edith? A. The next one to Edith? Well let me see. I have done forgot. Q. Is Edith living? A. Yes, sir. Q. Where is she living? A. She is living at Sandy with her husband. Q. She is married, is she? A. Yes, sir. Q. You don't know the next child's name; you don't know which one was the next one born? A. No, sir; I didn't say that. Q. You don't know the next youngest one to Edith? A. I was trying to study. You want to know the name of the child or where the child was birthed at. Q. I would like to know its name. A. Bill. I don't know where Bill was born; that is what I was trying to study. I believe that Bill was born at the Sam Robertson place or at the Irvine place one; I disremember which. Bill is dead. He died when he was 5 years old. I was living where I am living now when he died. He is not buried out close to where I am living now. They are all buried at the same cemetery. I was living where I am living now when he died. Bill was born on the Sam Robertson place or the Irvine place. Bill was the youngest child I have. I never had any more children after Bill. I never had any children born over on the place where I am living now. I said I didn't like the Sam Robertson place, and I moved over on the Lane place. I don't know how far that was from the Robertson place. It is a right smart piece. It is worse than 2 or 3 or 4 miles; it is a long ways. It might be 7 or 8 miles, maybe 9; I don't know, 8 or 9 miles. We didn't rent the Lane place; we went there and worked it. A colored man let us have the place to see if we would buy it, and we didn't like it. We went there to see how we liked it. We raised a little crop over there; we just didn't make anything. We stayed there one year, and we concluded we didn't like that place; then we moved over on our own place, where we are living now. We bought the place where we are living now. Levi said he bought that place from Mr. Powell. It is 7 or 8 miles from where we are living now to the David McWilliams place. This place where we are living now did not have a house on it when we bought it. We built the house. It did not have any field on it when we bought it. We put in the field. We moved over there, and we have been there ever since. We put in 50 or 55 acres over there. We put in pretty good sized field over there. My father died on the David McWilliams place. He has been dead 6 or 7 years, maybe longer. He died there in that house. My mother died since we tried this case before; she died here about two weeks ago.

My mother hasn't been here since year before last. Cynthia was my mother.

"We call the Richard Holmes place the Joe Hardy place. The Joe Hardy place and the Richard Holmes place is all the same thing. It is known by both names. I said we rented the place to Fowler. He is here. He is kin to me by marriage. He and my husband, Levi, are first cousins. He now lives up there at what they call the Pleasant Hill Settlement. He doesn't live on the Joe Hardy place. I don't know how long it has been since he lived on the Joe Hardy place. I don't know how many years it has been since he moved away from there. I don't know when he moved away from there. Nobody ever lived on the Joe Hardy place after he moved away from there that I know of. I have been there and tried to work on the Joe Hardy place since he left there. I didn't try to make any farm; I cleared up a little patch. Q. I mean up to the last year or two; there was nobody on that place or had anything to do with the place after Fowler left there? A. No, sir; we didn't rent it to nobody. There has been nobody on it and nobody cultivating it. It has not been 25 or 30 years since Fowler lived there. Twenty-five years ago, we were there. I am sure of that. I am sure we were there 25 years ago. I think we were living there 25 years ago. It is not a fact that I have been living down where I am living now for 25 years. I don't think we have been living there that long. I don't know how long we have been living there. As to whether or not it is a fact that the reason we left there after I married Levi was that Levi wouldn't pay the old man, my father, any rent and he made him leave, will say, I don't know anything about that. I do not know that is a fact; I don't know a thing about that. I do not know that my father made him move off the place. I don't know a thing about that. As to whether or not I mean to tell the jury now that I don't know that my father made Levi move off the place is why we moved, will say, I aim to tell them the truth about it. As to whether or not I heard my mother testify on the other trial of this case, will say I don't know anything about it. Of course, I might have heard it, but I have forgotten it. Q. You heard her testify that when you moved off, it was because Levi wouldn't pay your father rent? You heard your mother testify, didn't you, on the former trial? A. If I heard it, I have forgot. If I heard my mother testify on the former trial of this case that the reason that Levi and me left there was because we didn't pay any rent and my father made us move off, I don't remember it. As to whether or not that is a fact, will say, I don't know anything about it. If I heard it, I don't remember it at all. Q. How is it your memory is not so good about that? A. I don't know anything about it.

"As to whether or not it is a fact that he did make us move off because we didn't pay rent, will say, I don't know anything about it. We moved off of it because Levi took a notion to go and buy some more land. He bought more land when he found where he wanted to settle. We traveled around until we found out where we wanted to settle. We didn't move back on this place because we didn't see fit until we got ready. We never did get ready. We didn't see fit to move back on it, because we just didn't see fit. I say now that my father gave me that place. He did not give me any deed to it, for it wasn't deeded to him; he just paid for it and lived on it, and we lived on it and owned it. He did not give me any deed to it. I asked him for a deed to it, and he always told me he was going to do it. He never did do it. He died on the David McWilliams place there adjoining this place. I don't know anything about my father putting Levi off of the place. I don't remember my mother testifying to that. I don't know how came this Richard Holmes place, or

Joe Hardy place, to be known as the Richard Holmes place; only we called it the Richard Holmes place. My father's name was Richard Holmes. It was generally known as the Richard Holmes place; that is what people called it. As to whether or not I know that my father made an application to buy it, will say he bought it and gave it to me. I don't know anything about him making an application to buy it from the state; he bought it from Mr. Hardy and paid for it. As to whether or not he paid Mr. Hardy for the improvements and he thought it was vacant land when he went up there and he was going to buy it from the state, will say I don't know anything about that. I know he bought it and gave it to me, and had Mr. Allison Nations to run me out 160 acres. Mr. Allison Nations ran it out in two or three months after I went there. He had Mr. Allison Nations to run it out right after I went there. Q. He had the Richard Holmes place run out? A. You may say that, but he bought it and paid for it and had it run out and gave me 160 acres, me and my first husband, Dan Foster. My father had it run out, of course. He gave it to me. Of course the people called it the Richard Holmes place. It was mine. A heap of people called it mine. My father was named Richard Holmes, and he was living on the David Mc-Williams place. Up where I was living was known as the Richard Holmes place. I reckon Mr. Nations was the county surveyor. My papa told me he had him to run out 160 acres. I stated that I don't know when Fowler left there. I don't know where Fowler was living the next time I heard from him after he left there. I might have known, but I have forgotten. I don't know whether he was gone from there several years before I knew he was gone or not. I don't know whether he might have been gone from there 6 or 8 or 10 years before I found out he had moved or not. I don't know how came me to find out he had moved. I might have heard my mother testify that she rented the place to Fowler, but I have forgotten it. I don't know whether it is a fact that she did or not. As to whether or not I don't know whether she did or not, will say I have forgot. Fowler was living there before my father died. I don't know whether he lived there after my father died or not. I don't know because I don't know when he moved away. Q. Isn't it a fact that you heard your mother testify that Fowler lived there 2 years, and that he paid your father rent during the time he did live there? A. I don't remember hearing her state that. Q. You say you can't remember that when you were right here in this case suing for this land just the same a year ago as you are now, sitting here listening at your mother testify—why is it you can't remember what she testified to? A. If she said that, I don't remember it. Q. That was the truth whether you remember it or not? A. Truth about what? Q. That he stayed there 2 years; that he went there with your father's permission? A. I don't know anything about it, because Levi rented it to him. Q. You don't know about his staying there 2 years? A. Who? Q. Fowler. A. I don't know how long he stayed there, 5 or 6 years, might have been longer. Q. It might have been 20 years—you don't know when he left there? A. You are saying that. I don't know how long he stayed there because I don't know when he left."

Plaintiffs introduce the date of the marriage license of Dan Foster and Louisa Holmes; license issued October 4, 1871; ceremony performed by W. C. Southwell, October 5, 1871, and also offered in evidence the date of the marriage license of Levi Leonard and Louisa Foster; license issued April 26, 1881; ceremony performed April 28, 1881.

Levi Leonard testified as follows:

"My name is Levi Leonard, and I married Lou Foster. I married her on the 28th day of April, 1881. Lou was living on the Richard Holmes survey, known as the Joe Hardy tract of land, when I married her. After I married her, I went to Shanklesville and finished up my crop and moved back there on the place the 23d of August the same year. Her father, old man Richard Holmes, cultivated the place that year while I was gone. I went to Shanklesville to live that year because I had a crop started up there, and I went there to finish up my crop; the old man told me that he had bought that place for Lou, and had given it to her, and he would like for her to be close to him, and he would like for me to move back there on it. I moved back that same year. I lived there then until 1883. In 1883 I went up to old man Holmes and made a crop, but I worked a potato patch there on this place. Old man Dick worked the land. I worked a potato patch there during the year I went in Holmes' in 1883. I moved back in September some time, I think; I moved back on the place. I stayed there then, I think, until 1889; it was 1889. There were three of my children born on this place. The children that Lou testified about were born there. In 1889, I went to the Woods place. Q. Who, if any one, cultivated that place from the time you married Lou, in 1881, until you went to the Woods place? A. Who cultivated it while I was gone? John Fowler, my relative, John Fowler. Q. You get the question wrong, Who, if any one, cultivated the place from the time you married Lou, in 1881, from the time you moved back there from Shanklesville, until you went to the Woods' place? A. Her father cultivated it. He had a crop already on it. Q. You get it wrong, after you moved back from Shanklesville, who, if any one, cultivated the place from that time until you went up to the Woods place? A. Me; I cultivated it. I cultivated it every year. John Fowler cultivated it the year I went to the Woods place. I rented it to John Fowler. He paid me the rent, and 1 year I got him to pay it to the old lady, Cynthia. It seems to me that John Fowler stayed there on the place one time 3 years and he skipped 2 years, and then stayed there 2 years more. I rented it to him twice. I don't know exactly how many years he stayed on there the first time he rented it, but it seems to me like it was 3 years. That is what I think about it, but I don't remember exactly how many. He moved there right in behind me when I went to the Woods place, and he stayed there, I think, 3 years, at least 3, and I collected the rent from him. I rented it to him myself. John Fowler rented it from me twice. I think the last time he rented it was in 1900. That time he paid the rent to the old lady; I got him to pay it to the old lady, because she had nobody there to work for her to make a living; her old man was gone at that time. Lou and I were claiming the place while we lived there. Just to guess at it, there is about 25 acres open on the place, in the old field; there is 20 or 25 acres open on that place. When Lou and I married, the house on the place was a log house. I was there often between the time Lou's first husband left and the time she and I married. Lou was living there with them. When I went there, there was a log house on the place, and smokehouse and crib, etc., and that log house stood there until the third or fourth year after I married, and I then put up a hewed log house, hewed both sides of the logs, and put that up just on the outside of the fence; and of course there was a farm there; it had been there several years; it looked to me like 8 or 10 years before I married; I couldn't say exactly how long. I guess the hewed log house I put up was about like from here to one of those stoves out there from the house that Lou was living in

when I married her. We were living inside of the field near the fence, and we just moved on the outside. There was a crepe myrtle tree around the old place; it is there yet. It was in the field where we were living; there were also beech trees and apple trees, etc. This place was known as the Joe Hardy tract of land, but it was the Richard Holmes survey. It· was the same tract of land that Richard Holmes had surveyed out there for Lou. The house that I put up was on this tract of land, and the house that I married in was also on the same tract.

"I was raised in this county. I was born in 1858. I knew Dan Foster. When I first knew him, he was living up here at the place they call the old Charley Holmes place. He and Lou were not married then. I knew him before he and Lou married. I couldn't tell you when I first met Lou. We were kind of raised together. I couldn't tell you when I first met her; I was a little fellow. I knew her before she married Dan. I knew her when she and Dan were married. I knew both of them then. After they married, they lived on a little place up here where old man Dave Farr lived; he bought the place. It was not the Hinds place. It was the Holmes place at that time.· McBride bought it from Mr. Holmes, and he bought it from McBride. It was about a mile, I guess, from the Hinds place. As to whether or not they were living on the McBride place when I knew them when they were living together, will say it was the Holmes place at that time, and McBride bought it afterwards. It was known as the old Charley Holmes place. When Lou married Dan, she was living on the Hinds place. After they left the Hinds place, they went over on this place of McBride's. As to how long I knew them over there, will say that was about the first time I knew they were married, when they moved over there; they married that fall and moved over there and made a crop there the next spring, on the McBride place. They stayed there until that fall, and then they moved back on this piece of land we call the Joe Hardy tract. They lived. on the McBride place and moved from the McBride place to the Joe Hardy tract. They did not have any children when they moved on the Joe Hardy tract. They didn't have any until they moved there. They had one child. That child was born on the Joe Hardy place. Dan didn't live on the Joe Hardy place very long. He got into some trouble and left. I don't think he was there over two or three months. I think Lou had been there three or four weeks when old man Dick moved over there. He moved in one end of the same house, in the other end of the house, awhile, and I think Dan and Lou moved from there over to. the Dave Mack tract; he changed places with Lou, I think, because the David Mack house was the largest house. Q. Let's get that straight—he changed places with whom? A. With Lou and them, that fall, until they made' their crop.

"As to whether or not Lou and them were on the Dave Mack place, will say they went there and stayed about a month. She did not go from the McBride place to the Dave Mack place. She went from the McBride place to the Joe Hardy tract, and she and her pa changed places, and Dan moved over there, and he didn't stay over there, I don't think, over a month, before he got into trouble; then Lou moved back to her pa's over there on the Joe Hardy tract. Lou was living on the Dave Mack tract when she moved back there. She moved from the McBride place to the Joe Hardy tract. The old man moved from the Hinds place to the Joe Hardy tract. I don't know when Lou moved to the Dave Mack place, but it wasn't long after they moved to the Joe Hardy tract. It was just a month or two before Dan left. She was living on the Dave Mack tract when Dan left. I think the old man had bought the Dave Mack tract then. At any rate, Lou had moved over there,

and she and Dan were living on the Dave Mack tract when Dan left. Old man Dick was living on the Joe Hardy tract. Those houses are about a half a mile apart. Lou lived on the Dave Mack place about a month. She didn't live there any time after Dan left. Then she moved to the Joe Hardy tract where her father was. Q. They just exchanged places? A. No, sir; old man Dick still stayed there, and she moved there with him. Q. I thought you said they exchanged places. A. They did when Dan was living. Dan was living at that time. He moved in the house on the Joe Hardy tract, all of them together, and he was there about three weeks or a month, and he decided that house was too small for him and his family, and he moved over to the McWilliams place. Q. What do you mean by changing places? A. I am telling you.

"As to whether or not the old man never had lived on the Dave Mack tract at that time, will say he was going to move. They didn't really change. Dan and Lou just moved off of the Hardy tract to the Dave Mack tract. The old man hadn't been over on the McWilliams tract at that time. He hadn't been over there until me and Lou married. Lou had been on the Joe Hardy tract three or four weeks before she moved on the Dave Mack tract. Then she moved on the Dave Mack tract and lived there until Dan left. Then she moved in the house with the old man. I couldn't tell you who lived in the house on the Dave Mack tract. It seems to me that Aunt Charlotte and her daughter lived there one year; I don't know who it was. Lou was living over there on the Joe Hardy tract in the house with her father when I went to see her, when she was a widow. She was living there when we got married. When we married, we moved up to Shanklesville and we stayed up there until I raised my crop. The old man lived in the house on the Joe Hardy tract while I was up at Shanklesville. I think when we moved back down there, he moved out in a day or two after we got there. We moved in the house with him, and in a day or two he moved on the Dave Mack tract. I moved in that same house on the Joe Hardy tract. Nobody else lived there except Lou and I then; that is, not at that time. I said I cultivated the field there. I stayed there until I went to the Woods place. I went to the Holmes place and stayed a part a year during that time. I went to the Holmes place and made a crop and went back that fall. There wasn't anybody living on the Joe Hardy tract when I went to the Holmes place; I was cultivating it. There wasn't anybody living on that place while I was over on the Holmes place. Then I went back over there, and I stayed there 4 years before I went to the Woods place. It was not on the Woods place that those three children of mine were born. Those three children were born right there on the Joe Hardy tract. I am sure of that. Aus was born July 5, 1882; Hezekiah was born November 12, 1884, and Tom was born in 1886. Tom is the third child, and Hezekiah is the second. The first one was named Austin. Austin was born in 1882, and Hezekiah was born in 1884, and Tom in 1886. Q. And if Lou was right, and Tom was born on the Woods place, you were living on the Woods place in 1886? A. No, sir, I was living there at this place in 1886. Q. I say if Lou was right and Tom was born on the Woods place? A. She told it that Tom was born at the Hardy place. Hardy tract. Q. I believe she said that Tom was born on the Holmes place?

"I did not say that Edith was born on the Woods place. Edith was born at the Irvine place. Neither one was born on the Woods place. I went over on the Woods place because I just had a notion to buy it, and another thing the old man wasn't 'pleasant with me. The old man did not make me leave. He got mad with me because I left. I mean by wasn't pleasant that he · was disagreeable, hard to get

along with. I moved over on the Woods place with view of buying it. I did not stay there a year or two. I stayed there a part of a year, until fall, and I moved then over to the Irvine place, and stayed a year, and didn't like that. I made a crop over there. After my crop was gathered, I would move; I wouldn't stay at a place 12 months. It didn't take me a year to make a crop. As to where I was living when I didn't make a crop, will say, I moved to some other place. I said that I never lived at any one place a year until I got where I am now. I can make a crop every 8 or 10 months. I know a man can move to a place and make a crop and move to another place inside of 12 months. I think I left the Woods place in September, and went to the Irvine place. I went to the Irvine place in September. I did not make a crop on the Irvine place after I went there in September. I might have planted one there the next year. I lived there the next crop year. I made a corn crop there, and I am satisfied I moved before I got the crop made. I couldn't tell you exactly what month I moved. I remember riding over there and hauling corn to the Sam Robertson place. I went on the Irvine place in September, and I moved away from there before the next September. Then I went to the Robertson place. I did not raise a crop over there. I had some land rented when I lived there. I raised a crop on the rented land. The land I rented was on the Galloway place. I raised a crop on the Galloway place. I did not raise two crops there. I just raised one. I went to the Robertson place before the 1st of September, and I stayed there until I gathered a crop on the Galloway place. I gathered it in September. I moved then from there to the Lane place and made a crop there. I expect I gathered before the 1st of September. I am satisfied I gathered about August, and then went to this place where I am living now. I didn't make anything, and I hurried to get over there, and worked about to make provisions for my family. I worked mostly at Mr. Well's mill, on the survey. I did that one year. I then went to farming, clearing up land, where I am living now. I went there in 1895, I believe. In 1895, I made a crop on what they call the Joe Hardy tract of land, planted a solid corn crop over there, and I worked the place I was living on too. I worked the Joe Hardy place after I was living where I am now. Those places are about 8 or 9 miles apart. I would go down there and stay at my mother-in-law's while I was working the land. John didn't work it that year, and I worked it myself. I worked my place 8 or 9 miles from there, and made a crop up there too. I think that was in 1895. No one was living on the Joe Hardy tract that year. There was a house there. The house hadn't been torn down or fallen down. Q. You didn't stay there, you stayed down on the Dave Mack tract? A. No, sir. Q. I thought you said you stayed down there with your father-in-law that year? A. No, sir; I never did live on the Dave Mack tract. Q. I thought you said you stayed down there in 1895 with him? A. No, sir; I stayed where I am now. Q. Where did you stay when you were putting in your crop in 1895? A. I moved from the Lane place to where I am at now. Q. You said you put in a crop where you are living now, and also put in one on the Joe Hardy place? A. I said I worked my place in 1895 and worked the Joe Hardy place too. Q. Where did you stay? A. I stayed at my mother-in-law's. Q. That was on the Dave Mack place? A. Yes, sir. Q. You said you never did stay there? A. I didn't understand it. Old man Dick Holmes never did claim the Joe Hardy tract so far as I know. He always told me he bought that place for Lou and gave it to her and Dan, and Dan run off, and when we married he said, 'You take it, you all can make your living on it, you and Lou can have

it.' He never did claim it at all to me; he always told me he bought it for Lou. I claimed it. I claimed it when he gave it to me and her. As to whether or not I never did claim it when the tax assessor came around, will say they advised me not to tax it until I got my deed, but we paid taxes all right; we paid the taxes just the same. We paid taxes on both tracts of it. What I mean by both tracts is the McWilliams tract and the Joe Hardy tract. As to what I had to do with the McWilliams tract, will say he was old, and I helped him pay the taxes. As to whether or not I didn't claim the Joe Hardy tract when the tax assessor came around, will say, I always claimed it. As to why I didn't put it down for taxes, will say it was the tax assessor's business to put it down. Q. He swore you to what you claimed? A. I know one thing, the old man gave it to Lou. Q. You said you claimed it. Why is it you didn't claim it when the tax assessor came around every year? A. He might not have come around; I don't know. Q. I want to know why you didn't claim it when the tax assessor came around; why did you swear you didn't own it if you claimed it? You took a positive oath every year that you didn't own it, every year the tax assessor came around to get your rendition? A. I never was swore.

"It is a fact that old man Dick Holmes might have rendered it every year, but I helped him pay it. I do not know that he rendered it for taxes every year. I paid the taxes on it some years. I have not got the tax receipts on it. It was always turned in in his name. I did that because he hadn't given me anything to show it was mine, only by word of mouth. I don't suppose he had anything to show that it was his. I couldn't say that he got any deed to it. He always claimed the tax receipts; he always rendered them that way. I didn't render it because he was rendering it, and there wasn't any use in paying taxes on it twice. He has been dead for 8 or 10 years. I did not render it after he died, because other parties had gotten hold of it, and I wanted to see whose it was. As to whether or not nobody had gotten hold of the Richard Holmes tract or the Joe Hardy tract, will say they claimed a portion of it. I decided whenever we settled whose it was, I would render it for taxes. It is not a fact that old man Dick Holmes hasn't rendered and paid taxes on it for over 20 years. I think we have got tax receipts here to show that. I do not know that the reason I moved off from there was because I wouldn't pay the old man any rent. As to whether or not I heard Aunt Cynthia testify in this case when she was living, will say I heard part of the evidence. I did not hear that part of it when she swore that was the reason I moved off. I did not hear part of her testimony. I wasn't in the room all the time. I did not hear her say that. I did not hear her say that she rented it to Fowler; I wasn't in here. I might have been downstairs about that time. Fowler can tell you who rented it to him, I guess. I went down some 8 or 10 miles from there and bought me a place, T. & N. O. section No. 100, a piece of school land. I took it up, and made an application to the state to purchase it. I had a surveyor to survey it out for me. I have got a patent to it. I have rendered that for taxes. I claimed that when the assessor came around. I did not forget this piece up here that I claimed when the assessor came around. I never did put it in the rendition because some other parties were claiming it; they call them Lutcher & Moore, I believe. I found that out by hearing talk about it. I don't know how long they have been claiming it; 7 or 8 years, maybe more, I couldn't tell you. I have heard they have been claiming it for 7 or 8 years, maybe longer than that. That is not the reason I didn't claim it; I did claim it. That is the reason I didn't render it for taxes. That is not the reason I

swore every year I didn't own it; I didn't swear every year that I didn't own it. I said, 'Let it stand and let the law give it to whoever it belongs to.' I don't know who old man Dick bought the David McWilliams survey from, only just what I heard. He told me he bought it from Mr. Porter Parks. He bought it after he left the Hinds place. I don't know whether he bought it two or three weeks after he got upon the Hardy place or not; it might have been a year. He might have bought it when he moved down to the Hardy place. He thought there was 160 acres when he bought it. He claimed 160 acres. As to whether or not when he had it resurveyed, it didn't contain but about 60 acres, will say, that is what I heard. When he had the Joe Hardy tract surveyed, they claimed there was 160 acres in it. As to whether there is no Joe Hardy tract out there at all, will say it is the Richard Holmes survey. As to whether or not there is any such thing as the Richard Holmes survey in Newton county, will say there ought to be; they had the county surveyor to survey it out. I know where the Richard Holmes survey is claimed to be, where he showed me. There is not a place on the Richard Holmes survey called the King place. As to whether or not there is a place right close down there called the Charley King place, will say it is about a mile from there. I know where the King place is north of the Richard Holmes survey. I don't know anything about the Charley King place down on the Richard Holmes survey, but I know there is a place there that he claims. Charley King claims a place there. That is not on the Joe Hardy tract of land. It is on the place adjoining the place he gave her. It is not on the Richard Holmes place at all, and not on the land I claim out there at all. As to how far it is from the land I claim, will say I think it is adjoining land. I mean the lines join. In one place I know it connects; a line divides it, you know. The land that Lou and I claim lies southwest of where Charley King's lies.

"The land that Lou and I claim is where the houses were. It is the same tract of land that Mr. Nations run out there for old man Dick. That is the land we claim. The land I am claiming in this suit is the same land that was surveyed for Dick, known as the Joe Hardy survey and Dick Holmes survey. The year I lived on the Holmes survey after I moved off of the Joe Hardy tract, I cultivated a potato patch on the Joe Hardy tract, and my father-in-law cultivated the balance of it. When I was at the Woods place, John Fowler and my father-in-law both cultivated the Joe Hardy tract. I put John there. When I was at the Irvine place, John and my father-in-law cultivated it. When I was on the Sam Robertson place, my father-in-law was cultivating it. As to who was working it when I was at the Lane place, will say I think John worked it that year."

Mark Miller, the tax collector of Newton county, in possession of the tax rolls, and testifying from same, said:

"I will find the rendition of Dick Holmes, Richard Holmes. I have the tax rolls for the year 1887. That is as far back as they go. In 1882 he rendered the McWilliams and Richard Holmes improvements. In 1883, he rendered the David McWilliams 160 acres and Richard Holmes 160 acres. He made this same rendition until 1898."

The tax receipts were offered in evidence, showing taxes paid for the year 1887, Richard Holmes paid taxes on 160 acres of the Richard Holmes survey; in 1881 the same, in 1883 on the McWilliams and the improvements of the Richard Holmes, and for 1884 to 1895 the same payments made by Richard Holmes.

The second proposition under the assignments heretofore mentioned is as follows:

"The evidence shows that all occupancy had of the land sued for was by Richard Holmes under the mistaken belief that it was at that time public land and subject to pre-emption, and when the truth was discovered all claim thereto was abandoned."

J. W. Johnson testified:

"Mr. Nations was the county surveyor and was doing this on the application of my father and old Dick as purchasers. Old man Dick and my father came to Newton a few days before we made the survey after their files."

The field notes of the survey made by Richard Holmes in his attempt to pre-empt the land sued for as public land covered the Dickerson tract and a part of the McWilliams survey. That portion of the Dick Holmes location, being the land sued for, not covered by the John McGee league and being public land was awarded to T. P. Dickerson. The field notes of the David McWilliams 160-acre tract was corrected for Richard Holmes December 26, 1901, and by the corrected field notes it contained 62.4 acres, being the portion not in conflict with the McGee, but including the portion covered by the Dick Holmes location, not located on the McGee.

After the making of the corrected field notes of the David McWilliams, Richard Holmes continued to live on the McWilliams and died on the McWilliams, accepting the corrected field notes thereof, and holding the McWilliams by virtue of the corrected field notes, and made no effort to obtain the Richard Holmes location from the state, and permitted the portion of the Richard Holmes location not in conflict with the David McWilliams or the John McGee to be awarded to T. P. Dickerson, and the same is now owned and held under the Dickerson title.

It seems to be the contention of appellees that the land sued for was purchased by the father of appellee Lou Leonard, and by him verbally given to Lou, who subsequent to the gift occupied it under a claim of ownership or claim of right for the required length of time to establish in her a limitation title under the 10-year statute. Necessarily this requires that her claim of right in the property sued for should be antagonistic and hostile to the claim of all other persons, including her father, Richard Holmes. Richard Holmes died several years before the present suit was tried, and up to the time the corrected field notes of the McWilliams owned by him were made and it was discovered that the Holmes location was partially on patented land and conflicted with the McWilliams, Richard Holmes rendered the 160 acres sued for for taxes in his own name and paid the taxes thereon. Since the death of Richard Holmes, it is admitted that there has been no occupancy of any character of any of the land sued for, nor has there been any possession or occupancy of the land sued

for subsequent to the time the corrected field notes of the McWilliams were made.

[1] If it be conceded that Lou Leonard occupied the land sued for during any given period of time, still during all of such time she was a member of the family of Richard Holmes, her father, and Richard Holmes, the father, was actively asserting title to and claiming ownership in the identical land occupied by her. Richard Holmes, while she was occupying the land, and with her knowledge, attempted to file on the land, and with her knowledge attempted to file on the land in his own name. He made his application to purchase the land from the state as public land, not for her, but for himself. The facts revealed by the record show that he is the person making the application to purchase the land as public land. No application was made by Lou Leonard for that purpose. It is for Richard Holmes that the county surveyor is called upon to survey the land, in keeping with his application to purchase the same. It was for Richard Holmes that the surveyor acts in making the survey. Richard Holmes employed the county surveyor to make the survey. Richard Holmes' was in possession of the right under the application to purchase, to make the survey, and in person he delivers this evidence of this right to have the land surveyed to the county surveyor for that purpose, refusing to trust it to Lou Leonard, who according to her testimony is the owner of the property. These facts are undisputed, and do not reflect a gift, but they indicate a claim of ownership on the part of Richard Holmes himself. They do not indicate a claim of ownership or an adverse claim to the property occupied, on the part of Lou Leonard. For the time taxes were paid on this location of Richard Holmes it is Richard Holmes rendering this pre-emption for taxes as his property in connection with other property owned by him. It is Richard Holmes to whom the tax receipts are issued when the taxes are paid, and it is Richard Holmes that has paid the taxes on this location during all of the time it was occupied by Lou Leonard, and the evidence does not reveal a single instance of Lou Leonard either rendering the land for taxes or paying any taxes thereon, but does reveal the fact that Lou Leonard during all of said time was acquainted with the fact that her father, Richard Holmes, was rendering said land for taxes as his own, was paying the taxes thereon in his own name, and was asserting thereto in every notorious way possible a claim of right to the property.

The evidence further reveals the fact that Lou Leonard, if she ever occupied the property, did it with knowledge of this claim on the part of Richard Holmes, and, in our opinion before Lou Leonard could establish in herself a title to the property under and by virtue of the limitation statutes, she would be required to show a holding adverse to all,

other persons. The evidence in the record shows that the only assertion of ownership by any person was the claim of Richard Holmes during the period the property was claimed to have been occupied by his daughter, Lou, and Richard Holmes is not in this cause asserting any claim to the property. This suit is founded solely on the supposed gift from Richard Holmes to his daughter, Lou, and the subsequent occupancy, possession, and claim of ownership on the part of appellee Lou Leonard. The evidence shows also that Richard Holmes attempted to pre-empt the land, and that was during the time Lou Leonard resided thereon, and while Richard Holmes was rendering the land for taxes and paying the taxes thereon, he, as well as all other persons, looked upon the land as public vacant domain, subject to pre-emption. The testimony shows that the McGee league at that time was not definitely located, its whereabouts not generally known. It was generally supposed by all persons in that particular community that this land was vacant land, and that Richard Holmes, in attempting to locate on or pre-empt the same, regarded it as public land. The positive testimony of Johnson, the witness of appellee, and who was present when the survey was originally made for Richard Holmes, stated that it was at that time regarded by him and Richard Holmes and all other persons as public land. The John McGee league was definitely located some time about the year 1900, and in 1901 the David McWilliams 160 acres was resurveyed, and corrected field notes made thereon, and which corrected field notes were made to refer to the John McGee league, and recognized the John McGee league, but disregarded the Richard Holmes pre-emption, and Richard Holmes, then the owner of the McWilliams, and living thereon, accepted the corrected work, and after that time never asserted any claim, nor did he have any occupancy of any portion of the land sued for. Richard Holmes lived on the McWilliams tract at the time appellants acquired their record title to the McGee league, and Richard Holmes died without ever asserting any title to any portion of the McGee in conflict with the rights acquired by appellants in their purchase.

The testimony has been set out at length for the purpose of showing that the occupancy of the land for the time required by the statute was very uncertain; that the said occupancy rested almost entirely upon the contradictory statements of Lou Leonard herself; that the other testimony shows conclusively, not only that Lou Leonard did not and had not at any time paid taxes on the land, but that the taxes were assessed in the name of and were paid by her father up until the time the corrected field notes of the McGee were filed, and that after that her father did not pay taxes upon the land, and this continued up to and including the time he

died. The testimony is in such shape as this court could not say with any degree of certainty that either Lou Leonard had occupied the land for the time required to perfect her claim under the 10-year statute, or that the occupancy was adverse to her father and to all the world, or that the claim was probably made or shown in any way to indicate that it was adverse to the one paying the taxes and rendering the same for taxes, to wit, her father, Richard Holmes.

We are not unmindful of the fact that the jury had all of these witnesses and all of these facts before it for its consideration, and we would not be willing to disturb a verdict on these assignments alone, but, taken in connection with the fact, as hereinafter set up, and shown in the motion for new trial, we believe that the said motion, as hereinafter given, should have been granted by the lower court.

[2] The assignment of error complaining of the action of the court in refusing to grant a new trial on account of newly discovered evidence is as follows:

"The court erred in refusing to grant a new trial in this cause 'because of the newly discovered evidence of the witnesses, Bob Galloway, J. E. Marshall, Joseph Odom, Ned Gasoway, Robert Gasoway, Houston Pierce, and Berry Fowler, as shown by their affidavits hereto attached.' "

The affidavits show that these affiants knew Richard Holmes and Cynthia Holmes from the time before they lived on the Hines place until they died; that they lived on it all the time about 2 miles from them and knew them well and visited them often; that they remembered the circumstance of their moving from the Hines place and Lou Foster and Levi Leonard getting married. They further make oath that Richard Holmes and his wife, Cynthia Holmes, moved from the Hines place to the David McWilliams place, where they lived until they died; that they lived in the same house on the McWilliams place from the time they first went there until Richard died; that Lou Leonard lived in the house with them after Dan Foster left all the time until she married Levi Leonard, and she was living there when she married Levi.

The record reflects that a large part of the occupancy relied on by appellees of the land sued for was that of Holmes himself. The testimony of appellee not only was practically all the evidence had with reference to the alleged gift by her father to her of the land in controversy, but also the testimony with reference to the occupancy by herself and her father of the land largely rested upon her statements. If the testimony of the witnesses, whose testimony is sought to be had in this case, is true, then the testimony of Lou Leonard with reference to limitation, and as to the facts and times which she and her father occupied the land in controversy took place, were not true. In other words, this court can have no doubt with reference to the materiality of the testimony, and cannot say, in the light of the record, that if said testimony had been produced on the trial of this cause, the result would not have been different. We are much opposed to disturbing a verdict of the lower court on the ground of any newly discovered evidence, and would not do so if, in our opinion, the justice of the case had been attained.

As said by Chief Justice Wheeler, in the case of Mitchell v. Bass, 26 Tex. 376:

"The losing party too often finds it an easy matter to obtain new evidence to supply former deficiencies. It is easy to claim the discovery of new evidence when the claim is really unfounded or the result of negligence in the first preparation; and it would be of dangerous consequence to the rights of parties and the safe administration of justice for the courts to grant new trials to parties merely to correct their own error, when they discovered where they were deficient, and when the requisite industry and vigilance would have supplied the deficiency in time. Such motions are received with careful scrutiny, and are held to address themselves very much to the discretion of the court; and, where the court has refused an application made upon this ground, the appellate court will not reverse, unless it shall appear that the court below has not exercised its discretion according to the established rules of law. Yet, much as should be left to the discretion of the court, and reluctant as the appellate court may be to interfere with the exercise of that discretion, there are cases where the established rules of law and the principles of adjudged cases would be disregarded if a party was denied a new trial upon newly discovered evidence. The party who brings himself within the principles of such cases is entitled to a new trial as a matter of right, unless it be in those cases where it is apparent to the court that the justice of the case has been attained. Where there can be any doubt of the justice of the verdict, to refuse a new trial, when the party has really discovered new evidence of a conclusive tendency, would be against justice and precedent. * * * We do not regard it as liable to the objection that it is cumulative evidence. It is not proposed to multiply witnesses to any distinct fact or circumstance testified to by witnesses upon the trial; but it brings to light a new and independent truth, which the testimony upon the trial sought, but in vain, to prove."

In Hilburn v. Harris, 2 Tex. Civ. App. 395, 21 S. W. 573, it is said:

"It is desirable that there should be an end of litigation with as little delay and expense as possible consistent with the great end of litigation, a correct decision of causes according to their real merits; but it should always be sought in subordination to the great end to be attained."

The parties plaintiff to this action are negroes. The period of possession upon which limitation title is founded extends from 1872 until 1887. At the time of defendant's purchase of the property there was no possession nor evidence of possession, and no actual assertion of ownership in the plaintiffs or any other person. Defendants were not residents of the county. They were required to rely on the efforts of employed agents to obtain such information with reference to the possession of the plaintiffs as could be had. They used the utmost diligence in the selection of agents, hiring Mr. Cox, who was an old resident of the county and acquainted

with the old inhabitants, and in addition to his services obtained the services of Mr. Howard, an old resident and office holder of the county. It is shown in this connection that the testimony was discovered after the trial in the district court; that the defendants in the case, as above stated, were not acquainted wih the inhabitants of Newton county, personally, and did not come in contact with them. The agents employed by appellants failed to discover the witnesses discovered since the trial.

As we have before set out, the testimony of the witnesses is not only relevant and very material, but it is very probable, to say the least of it, that this testimony might change the result on another trial, and, as above stated, the testimony with reference to the occupancy of appellee Lou Leonard, and that of her father, was practically relied on by the appellee to sustain her contentions. This record is not in such shape as that this court could say that justice has been met in the cause. If the jury had been furnished with this newly discovered testimony, the result, perhaps, would have been different. At least, the appellants having shown reasonable diligence to obtain the same, we are of opinion that a new trial should have been granted.

Therefore, in order that justice may be done, this cause is reversed and remanded for a new trial.